NOT DESIGNATED FOR PUBLICATION

Nos. 122,262
122,263
122,264

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of J.L., A.L., and M.L.,
Minor Children

MEMORANDUM OPINION

Appeal from Miami District Court; AMY L. HARTH, judge. Opinion filed June 19, 2020. Affirmed.

*John L. Domoney*, of Domoney & Domoney, of Paola, for appellant natural mother.

*Richard M. Fisher, Jr.*, of Richard M. Fisher, Jr. LLC, of Osawatomie, for appellant natural father.

*Rebecca S. Silvermintz*, assistant county attorney, and *Elizabeth Sweeney-Reeder*, county attorney, for appellee State of Kansas, and *Steven M. Ellis*, guardian ad litem.

Before POWELL, P.J., GARDNER, J., and WALKER, S.J.

PER CURIAM: Mother and Father appeal the termination of their parental rights to their three children: J.L., A.L., and M.L. They argue that there was insufficient evidence to support the district court's finding that they were unfit parents and that their unfitness was unlikely to change in the foreseeable future. They also argue that the district court abused its discretion in terminating their parental rights. However, extensive evidence presented at the termination proceedings established that the parents were unable to maintain clean and safe housing for their children over the course of several years and that the parents could not maintain a stable monthly income or prepare a budget. Based

1

on the totality of the evidence and testimony presented at trial, the district court determined: (1) The parents were unfit pursuant to K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8), and (c)(3) by clear and convincing evidence; (2) their unfitness would not likely change in the foreseeable future by clear and convincing evidence; and (3) it was in the children's best interests that Mother's and Father's parental rights be terminated. Because there was clear and convincing evidence to support these findings and because the district court did not abuse its discretion in terminating Mother's and Father's parental rights, we affirm the district court's decision.

FACTS

*Procedural history*

On September 13, 2017, Mother and Father's three adoptive children, 15-year-old J.L., 11-year-old A.L., and 10-year-old M.L., were taken into protective custody after the Kansas Department for Children and Families (DCF) received multiple reports alleging that the family constantly smelled strongly of urine and that the family's unsanitary living conditions posed a threat to the children. That same day, the State filed three separate petitions alleging that each child was a child in need of care (CINC). On September 14, 2017, the district court ordered that the children be placed in DCF's temporary custody.

On October 16, 2017, the three children were adjudicated children in need of care pursuant to K.S.A. 2017 Supp. 38-2202(d)(1). A little over a year and a half later, on July 2, 2019, the State and the guardian ad litem (GAL) filed a motion for a finding of unfitness and termination of parental rights. The motion specifically alleged that while the parents had complied with several of their case plan tasks, they continued to be unable to provide a safe and sanitary home for the children to live in. The State and the GAL specifically asked the district court to find the parents unfit pursuant to K.S.A. 2019 Supp. 38-2269(b)(1), (b)(7), (b)(8), and (c)(3). The State and the GAL further requested

that the district court terminate Mother's and Father's parental rights. The district court set the matters for a termination hearing on August 26 and 27, 2019.

*The termination hearing*

At the termination hearing, the State presented witness testimony from Jennifer Stockard, a DCF child protection specialist who initially investigated the several allegations of abuse and neglect by the parents, and from Chauncey Hester, the Kaw Valley Center (KVC) permanency case manager assigned to the cases. These witnesses outlined the factual basis for the initial removal of the children from the home and testified as to the progress made in reintegrating the children with the parents over the course of the case. After the State rested, Mother and Father each testified on their own behalf. There were no additional witnesses called at the hearing. We will summarize the testimony from each witness at the termination hearing.

*Jennifer Stockard's testimony*

Stockard testified that she was responsible for investigating a "number of concerns" relating to Mother and Father's home in Paola. The first report she received about the family was in December 2014. She went to the family's home to investigate the claim and observed that the house smelled strongly of urine, that it was "very, very cluttered," and that it had an overall foul odor to it. She testified that she saw items stacked from floor to ceiling throughout the home. Father told Stockard that he was a hoarder, which prompted a discussion between the two about mental health services that could address those issues. Stockard also advised the parents about and initiated Family Preservation services that could help the family address the home's unsanitary condition.

Stockard testified she returned to the home in January 2015 after receiving a second report about the family. She noted that there had not been any change to the home's condition and that it had remained relatively the same since her previous visit.

Stockard returned to the home a third time in February 2015, and testified that the family's home was virtually in exactly the same condition. Specifically, she stated it still smelled very strongly of urine that that it was still very cluttered.

Stockard once again returned to the home in May 2015 after receiving another report. She testified that the family had made some attempts to declutter the home, but overall the foul urine odor was still an issue and the condition of the home had not substantially changed. Stockard described the clutter in the home as follows:

"[Y]ou would walk into the home in the dining area. The kitchen just had—I mean, the table, the dining room table was just covered in items.

"Along the walls, boxes, bags, loose items were stacked up on the walls. It was that way then as you continued into the living room.

"In the kids' bedrooms, there was clutter—there was a pathway to the bed, but basically their closets were overflowing with stuff.

"I could not even walk into the parents' bedroom. It was so overflowing with items.

"There was actually a bathroom through the parents' bedroom that I could never even gain access to because of so much clutter piled in that room.

"There was actually an upstairs bedroom. There was clutter piled on the stairs. I couldn't even gain access to that second story room."

Stockard added that because the excess clutter made it difficult to move through the house, she was concerned about fire hazards. She further testified that during this visit she observed urine and fecal stains all throughout the home. Stockard noted that the overall cleanliness of the home remained an absolute concern. Following this visit, the oldest child, J.L., was removed from the home because of allegations that Father had

physically abused him. A CINC case was filed as to J.L. at that point, but it is not the same underlying CINC matter that is presently before us.

Approximately eight months later, in January 2016, Stockard received yet another report and revisited the home. At that point, only two children—M.L. and A.L.—were living in the home. Since J.L.'s removal, the family had been receiving services through KVC. The report Stockard received alleged that A.L. and M.L. smelled overwhelmingly of urine while they were at school. School staff had previously attempted numerous interventions with the family to remedy the odor issue, including having the children change into clean clothes before school started and then later removing the clean clothing before returning home, but reported their efforts were to no avail. On one occasion, M.L.'s backpack smelled so strongly of urine that school staff had to put it in a plastic bag, and staff told the parents not to bring it back.

Stockard tried visiting the home on January 11, 2016, but no one answered the door. She testified that she had to schedule an appointment with the parents to walk through the home on January 14, 2016. Stockard noted that she was able to keep that appointment despite the parents' effort to cancel it. She testified that the home still had a "very, very foul odor" and that, while there had been some attempts to clean up the home, the condition of the home remained substantially unchanged from her previous visits. Specifically, Stockard described the state of the home during this visit as follows:

"[The parents] had removed the carpeting in the main . . . living area of the home. They had removed some items. So what I did notice in the areas they had removed were just an abundance of rodent droppings. In one area of the hallway under the staircase, they had removed some items and there appeared to be . . . a rodent's nest in there. There was just mouse droppings on the window sills, on the furniture in the living room like where the TV sat, that type of thing."

5

She testified that she discussed the rodent issue with the parents, and they told her they were taking care of the issue and had not seen a live rodent in the home in two to three weeks. Yet even in that time, they failed to clean up the rodent droppings.

During the same January 2016 visit, Stockard observed several additional concerns. She noticed that human feces had been smeared on the walls in the living room and in J.L. and M.L.'s shared bedroom. The parents initially blamed J.L. for the feces, but when Stockard mentioned that J.L. had not been living in the home for several months at that point, the parents then blamed M.L. for the issue and could not explain why it had not been cleaned. Stockard also mentioned the foul odor to the parents, which Mother said she could smell but Father said he could not. The condition of the children's bedrooms was virtually the same as it had been during Stockard's May 2015 visit. She testified that the kitchen was cluttered with dirty dishes in the sink, and food and other items were stacked up on the countertops. She stated that there were two full-size refrigerators in the kitchen, and when she opened them, she saw that most of the food appeared rotten, the refrigerators contained dead insects, and there was a foul odor emanating from them. She also noticed that food had been splattered on the wall in the dining room.

Stockard and the KVC workers who were present with her during this visit gave the parents step-by-step instructions on what needed to be done to clean the home. Mother told her that they had really tried to clean the home, but at some point she had broken her ankle and they were having financial issues, which slowed down their progress.

Following the January 2016 visit, Stockard requested that M.L. and A.L. be removed from the home because of its unsanitary living conditions. The State filed CINC cases as to M.L. and A.L. at that time, but those cases are different from the underlying CINC cases presently before us.

6

At some point, all three children were reintegrated into the home, yet in January 2017, Stockard received another report concerning the home's unsanitary conditions. She testified that she once again visited the home and the conditions had remained largely the same. There was still a very foul odor permeating the home, and there was still no carpet in the living room. In A.L.'s bedroom, Stockard observed that the child's mattress, sheets, and covers were soaked with urine. In fact, she noted that there was an indentation on A.L.'s mattress as a result of being soaked with urine. When Stockard asked the parents about this issue, they told her they did not know A.L. had wet the bed. Stockard stressed to the parents that they needed to get rid of the mattress because it could not be cleaned. She also discussed having the parents purchase a mattress with a plastic cover to help with clean-up related to bedwetting. While the parents acknowledged they understood, they made no attempt to clean up the urine-soaked bedding while Stockard was there.

Stockard further testified that during this visit she once again spoke with Mother and Father about cleanliness issues. She observed that while some of the clutter had been removed from the home, the children's hygiene was still an issue. She discussed what they could do to make some minimal improvements. At the time of the January 2017 report, the parents were also still receiving KVC services. Stockard recommended that the family continue with the children's mental health services, the parent support services, and the KVC aftercare services to work on cleaning up the home. At that time, she also recommended that the parents seek mental health services for themselves. Even though Stockard had previously recommended that Father specifically seek out mental health services, to her knowledge Father never did, except for an occasional visit to his private psychiatrist to refill his prescriptions.

In August 2017, Stockard once again received a report regarding the family, which included allegations about the unsanitary condition of the home and the fact that the children smelled of urine. She visited the home and observed that the house was in essentially the same condition that it had been during the January 2017 visit. The home

still smelled very strongly of human urine—so much so that it made Stockard's eyes water. The parents stated they did not smell the urine odor, but Stockard said that when she later left the home, she smelled like the odor in the home. Specifically, she testified that the odor "clung" to her clothes and hair. She stated this was how the home smelled during every one of her previous visits.

During the August 2017 visit, Stockard also noticed that while the mattress in A.L.'s bedroom had been replaced, the new mattress and bedding were once again soaked with urine and had not been cleaned. When she addressed the bedwetting issue with the parents, they told her that they did not know A.L. had wet the bed that day.

Stockard also observed that the overwhelming clutter in the home was still a fire hazard issue. She noted that the parents had done some work cleaning the children's bedroom, such as working on eliminating the piles of large trash bags that had been stacked in their closets. She also observed that the fecal stains had been cleaned from the walls. However, the overall condition of the home remained largely the same. Following this visit, Stockard requested that all three children be removed from the home, which formed the bases of the three CINC cases now on appeal.

*Chauncey Hester's testimony*

Hester, the KVC permanency case manager, testified that he began working with the family in September 2017—after the children were removed from the home and placed in DCF custody. On October 3, 2017, Hester and the parents participated in the case plan meeting for the three children. Parents' case plan tasks were the same for all three children:

- Mother and Father were to submit random drug screens as requested.
- Mother and Father were to maintain stable, clean, and safe housing.

8

- Mother and Father were to obtain and maintain a stable source of income and provide documentation verifying that income to KVC on a monthly basis.
- Mother and Father were to complete and submit budgets to KVC as requested.
- Mother and Father were to obtain and maintain stable transportation and they were required to provide valid driver's licenses and proof of insurance to KVC.
- Mother and Father were to complete any and all releases requested by KVC.
- Mother and Father were to complete a psychological evaluation and to follow all recommendations of that evaluation.
- Mother and Father were to provide a written list of their prescription medications and accompanying dosages to KVC.
- Mother and Father were to sign releases so that KVC could obtain their mental health records and information from past psychiatrists.

Hester testified that the parents complied with several case plan tasks. For example, the parents always complied with and passed their drug screens, they signed any releases that were requested, they provided their prescription medication list to KVC, they were able to maintain stable transportation and provide the requested documentation to KVC, and they completed psychological evaluations. However, Hester testified that throughout the course of the case, Mother and Father failed to obtain and maintain a stable source of income, they could never provide a budget because they could not show they were maintaining a stable source of income, and they were unable to maintain clean and safe housing. Hester also testified about some of his concerns after reading the results of the parents' psychological evaluations.

Hester testified that at one point in 2018, Father was temporarily employed with Verizon, but he never provided KVC with any of his income information from that job. Other than that, Mother and Father were largely unemployed throughout the pendency of the cases. The parents also failed to provide KVC with any documentation about their job

9

searches or any information about their sources of income as required by the case plan. Because of this, Hester testified that the parents failed to comply with this case plan task.

Hester also testified that the parents were required to complete budgets when those were requested. However, Hester explained that he was never able to request these budgets because he was waiting until either parent was employed for at least one month, at which time they would work out a budget together. Because the parents failed to obtain and maintain steady employment and failed to provide Hester with proof of a stable monthly income, the parents were never able to fulfill this case plan task.

Hester then testified at length about the parents' partial compliance with the task of maintain stable, clean, and safe housing. He explained that while the parents made progress toward cleaning the home after the children were placed in DCF custody, he was concerned about the amount of time it took them to make any progress.

Hester first visited the home on November 1, 2017. He observed that the attic and the enclosed back porch were so full of clutter that it was unsafe for him to enter. In fact, he was unable to physically walk into the attic because of all the clutter. He testified that all of the bedrooms were in disarray and that the home "reeked of urine." He explained that the urine smell was "overpowering." Hester noticed that the carpet had been pulled up in the living room. Where that carpet had been pulled up, Hester testified that it looked like something seeped down through the carpet and into the subflooring and that it did not look very sanitary. He also noted that the rest of the main floor of the home and the stairs leading up to the attic had carpeting that was stained and smelled strongly of urine. He estimated that over 80% of the carpet in the home was stained.

Hester then described the condition of the bedrooms. He explained that A.L.'s room was cluttered and had stained carpet. Hester stated that A.L.'s closet was filled with clothes. He also noticed that A.L. had an air mattress for a bed and that her whole room

smelled strongly of urine. In J.L. and M.L.'s bedroom, the closet was filled with clothes, the carpet was stained, and the room also smelled. Hester did not enter the parents' bedroom because there was too much clutter on the floor. He testified he was mainly focused on the children's bedrooms and the rest of the house.

Hester observed a lot of clutter in the kitchen. While it seemed to have some sort of organization, he stated that there was more stuff in the kitchen than cabinet space would allow. Throughout the rest of the house, there were bookshelves, lots of books, and lots of bags containing clothes, papers, or folders. He testified that he had to step over a lot of stuff to make his way through the home.

Hester also testified that he had concerns about the outside of the home. On the right side of the home heading toward the backyard, Hester observed lots of bags. It was unclear at that time whether those bags were filled with trash or other items. The porch also had several bags piled on a small sofa. Again, it was unclear at the time whether they were filled with trash or other items.

Hester explained to Mother and Father that hoarding was a safety concern, especially because J.L. was intellectually and developmentally delayed. Hester was particularly concerned about the attic because if the children were playing up there, objects could fall on them. The parents explained to him that the children were not allowed to go up to the attic, but Hester did not think this was realistic given the children's ages and the likelihood of children that age rummaging through the home. He agreed to revisit the cleanliness issue with the parents in six months and that at that time he expected the home to be much cleaner, i.e., he should be able to walk through the home without having to step over everything, and it should be more organized. Mother and Father took issue with Hester's request, but he explained that the house had to be cleaned because they could not properly address the odor or hygiene issues without first cleaning the house.

Hester added that the day the children were removed from the home, they smelled heavily of the odor of urine, to the point that the worker who brought them in had to spray down the interior of her car. He stated that the children essentially smelled like the house. Although Mother and Father provided DCF with an extra set of clothes for the children, those clothes also smelled like the home and placement purchased new ones for the children.

On January 19, 2018, Hester returned to the home. He noted that the home was not as cluttered as his previous visit and that the parents had put in noticeable efforts to clean it. Although he observed some progress, he told the parents that he expected a lot more to be done after six weeks. The attic remained unclean, there were still bags all throughout the inside and scattered all over the outside of the home, and there was still an odor of urine. Hester explained to the parents that reintegration hinged on their ability to keep the house sanitary. He also explained to them again that they could not address the overbearing odor issue effectively without removing everything from the home and cleaning it top to bottom. As of that walkthrough, Hester did not think it was appropriate for the children to be in the home, so visits were not being held there.

When Hester revisited the home again on April 27, 2018, he brought his supervisor along with him. He noticed that the parents had made additional progress in cleaning the home, but there was still a lot of clutter inside and outside the home. Hester also observed holes in some of the walls. The parents explained they were having plumbing issues, which was the reason for the holes. The parents also explained there was no running water in the home. Both Hester and his supervisor agreed after that walkthrough that visits with the children would remain outside the home.

For the next year, Hester attempted several visits to the home, but they were either canceled or the parents were not home. He planned to go to the home in August 2018, but he did not do so after learning about mold concerns that needed to be addressed in the

home. He attempted another visit on November 5, 2018, but the parents canceled the visit because of a medical emergency. The visit was rescheduled for November 20, 2018. However, the parents once again canceled due to a medical emergency and never contacted Hester to reschedule. Hester tried to do an unannounced visit on January 28, 2019, but the parents apparently were not home. He attempted another unannounced visit on April 3, 2019, but once again the parents did not answer.

Hester was not able to visit the home again until April 27, 2019—exactly a year since he had last done a walk-through. The most noticeable change was that Mother and Father installed new carpet in the living room. He noted that there had also been some progress made on cleaning the children's rooms, i.e., he did not have to step over anything to walk through their rooms. Aside from that, Hester testified that much of the house remained relatively unchanged from his April 2018 visit. He stated that he could not go into the basement because it was flooded. He said that the odor in the home was still the same as it had been. He also noted that the outside of the home still looked the same. Hester testified that he still did not believe it was safe to have visits with the children in the home. This was due in large part to the foul odor in the home—every time he left the home, Hester stated that he would smell like it for almost a half hour.

Hester visited the home again on June 27, 2019. He observed that Mother and Father had continued to make progress cleaning the home. Specifically, he noted that the house was more organized inside, the children's rooms were acceptable, the stairway leading to the attic had been cleared, and there were no bags in the main living areas. However, he testified that minimal progress had been made in cleaning up the outside of the home, that the carpet throughout much of the home was stained, and that the whole house still smelled of urine. Because the odor in the home still had not been addressed, Hester did not think it was safe for visits to occur in the home at that time.

13

Hester testified that he once again visited the home on August 26, 2019, immediately after the end of the first day of the termination hearing. When he first pulled up, he noticed that the grass had not been mowed in quite some time. He also saw that there was still a lot of clutter on the front porch, and there were still bags along the right side of the house. Once inside the home, Hester noticed that the living room and dining room areas were still clear and that it was a lot more organized since his last visit. He observed the parents had obtained new bunk beds for J.L. and M.L's bedroom, they had patched the holes in the walls, and A.L.'s room was still clean. He also noted that the parents' bedroom did not appear to be too cluttered. However, much of the carpet throughout the home was still stained. He noticed that the backyard had remained relatively unchanged. Hester also stated that he had a cold during the visit, so he could not tell if the odor was still present at the time—all he could smell were the scented plug-ins the parents had installed. He testified that he later learned the odor was still present because people noticed the original odor on him after he left the home.

On cross-examination by Mother's counsel, Hester also testified about his concerns regarding the results of the parents' psychological evaluations. Specifically, the evaluation noted that the parents would need constant significant services just to maintain a baseline level of functioning for the household. Hester testified that the evaluation indicated the parents would be unable to care for themselves or their children, and this was a major concern because J.L. was intellectually and developmentally delayed. Because of these concerns and the condition of the home, Hester supported the State's motion for finding of unfitness and to terminate parental rights.

On cross-examination by the GAL, Hester testified that he believed it was in the children's best interests that they find another permanent placement. He stated, based on his experience with the family after almost two years of working with them, he believed the family's situation would continue to repeat itself. Hester worried that the family

14

would require ongoing case management services just to maintain the children in the home.

*Mother's and Father's testimonies*

The parents testified largely about the case plan tasks that Hester claimed they did not complete or only partially completed.

Mother stated that she and Father were able to maintain a stable monthly income. She testified they received a $1,600 monthly adoption subsidy and that Father received between $450 and $470 per week in unemployment benefits. She also explained that they sold their Corvette, a home they owned, and various items from the home to bring in more income. Mother further testified that she had been unemployed since they adopted the three children 10 to 12 years before. This was largely because when the children came to live with the parents, J.L. was a special needs child and all three children required special medical and mental health attention. As a result, Mother began staying at home with the children to care for their needs. Mother testified that while she had been applying for jobs during the pendency of the cases, it was difficult for her to find employment because of how long she had been unemployed. She further testified that if she were to go back to work, she was concerned about finding appropriate childcare, particularly since J.L. needed a caretaker who was knowledgeable about his needs.

Mother also testified about the progress made on cleaning the home and the financial limitations that prevented them from cleaning the home faster. Specifically, she testified that they spent just over $34,000 throughout the course of the cases to repair and clean the home:

- $270 spent on purchasing a severe urine neutralizer product to help remove urine stains from the home.

- $363 spent on purchasing Febreze plug-in odor neutralizers.
- $2,400 spent on new carpeting in the living room, hallway, the children's bedrooms, and the dining room.
- $975 spent on fixing up the family vehicle.
- $12,000 spent on paying the past-due first mortgage on the home—Mother specifically testified this was the amount that needed to be paid to avoid foreclosure.
- $2,600 spent on paying the past-due second mortgage on the home—Mother specifically testified that the parents got behind on this mortgage because of their unemployment.
- $1,256 spent on new flooring for the kitchen and bathroom.
- $300 spent on materials to remove the mold that was previously in the home.
- $4,150 spent to replace the water pipes underneath the home as the previous pipes froze and burst.
- $2,000 spent on a plumber to install a hot water tank and repair the bathroom plumbing.
- $1,150 spent on moving truck and dumpster rentals to remove clutter from the home.
- $2,995 spent on a mold inspector to test and treat the mold in the house.
- $250 spent on new bunk beds for J.L. and M.L.
- $550 spent on truck rentals to move furniture from Father's dad's home to Kansas City.
- $2,760 spent on renting storage lockers so the parents could clear clutter from the home.

Mother further indicated that they were able to pay for these costs largely due to a $23,000 loan they received from Father's mom, selling various items in the home or

property they inherited from Father's dad, and from Father's salary when he had a temporary job.

On cross-examination, the State highlighted the fact that the children were previously removed from the home due to the unsanitary conditions but that the children eventually went back home after the parents remedied the condition. The State questioned Mother about why the parents allowed the home to become unsanitary again, and Mother explained that she did not know how it happened. She stated that oftentimes she would not notice things about the children right away, that she had various medical conditions over the years that prevented her from cleaning, and that the parents suffered from depression. When asked why it was taking so long for the parents to clean the home in these cases, Mother admitted that in addition to these previous issues, she had an emotional attachment to the items they had in the home, making it difficult for them to completely get rid of things. In fact, they moved several items from the home to two storage units. When asked if Mother or Father participated in individual therapy to address these issues, she said she did not see a need for it. Mother provided no substantive answers as to how the parents would avoid relapsing into old habits, aside from the fact that the parents did not have the money to acquire more things, that she preferred the house to be clean, and that the children should be more responsible in helping with the household cleaning.

On cross-examination by the GAL, Mother could not provide any substantive answers on how the parents would prevent the situation from happening again. Specifically, she stated that she would just continue taking her medication, better control her stress levels, create to-do lists, ask Father for more help when she feels overwhelmed, and eat healthier. When asked about the concerns noted in the Mother's psychological evaluation that Mother tends to isolate and withdraw when demands on her are too high, she disagreed with the assessment and said she would create space where she could meditate or gather her thoughts. When asked why she was not spending "every waking

moment" to clean the home so the children could return, Mother testified that she did not know why.

Father's testimony largely mirrored Mother's. He explained that he had a contracting job with Verizon from April 2018 through April 2019. He testified that he used that salary—approximately $70,000—to pay past-due bills and for repairs on the home. Otherwise, for the pendency of the cases, Father has been unemployed and searching for work. As for cleaning the home, Father blamed KVC for its failure to help the parents come up with a detailed action plan about how to clean the house. He testified that if they had received such a plan, he would have "at least tried" to comply with the tasks in it. He reiterated Mother's testimony about the expenses they incurred to repair and clean up the home, and admitted there was still work that needed to be done on the home. Specifically, Father testified that he did not know what to do with the items still on the front porch and that he had only begun cleaning up the backyard earlier that week.

On cross-examination, the State asked Father how the home got to the condition it did the first time the children were removed from the home. Father responded that it was largely due to his depression and because he previously worked 40 hours a week. When asked about how the house became unsanitary the second time, Father said that it was not that much messier than when the kids were returned after the first CINC cases. He also admitted to having a hoarding issue. The State asked Father how he would manage his depression, and he testified that he would stay on his medication and keep having 30-minute check-in appointments with his psychiatrist every two to three months. When asked when his next appointment with his psychiatrist was, Father admitted that his doctor was on sabbatical for an unknown amount of time. Father also admitted that he had not sought individual therapy for his depression.

On cross-examination by the GAL, Father also was unable to provide substantive answers as to how the parents would avoid relapsing into old habits. He stated that they

came up with an action plan to get rid of things daily and that he was working on being more observant and involved in helping with the house. The GAL pointed to a concern in Father's psychological evaluation where he admitted he had difficulty maintaining the house on his own. When asked how he would help with the house if Mother were to have another medical issue, Father stated that he would simply ask for more help from friends and family. The GAL also asked Father about the concern in his evaluation that he was unable to function at a level to provide proper care for the children. Father explained that it was more of a concern about finances and less a concern about his emotional function. The GAL also asked Father to respond to the concern in the evaluation that the parents would need ongoing case management services to function and provide a safe environment for the children. He responded that the family would not need all of those ongoing services because they have learned a lot from the current ones in place. Nevertheless, he conceded that the family would obviously benefit from additional ongoing services.

At the close of the proceedings, the district court took the cases under advisement.

*The district court's ruling*

On September 30, 2019, the district court called a hearing to deliver its ruling on the State's motion. It found that the State presented clear and convincing evidence that the parents were unfit pursuant to K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8), and (c)(3).

In reaching its decision, the district court found that while the parents had made progress on many of the case plan tasks, they only did so in varying degrees. For example, Father had a job but was never clear with the KVC worker about what his income was, and Mother never obtained employment, so a budget was never discussed or submitted. In the almost two-year life of the cases, the parents were also never able to maintain safe, stable, and clean housing as required. Consequently, the parents were

never able to have visits with the children in the home because of the unsanitary conditions and their inability to address those conditions. The court noted that the parents blamed KVC for not telling them how to clean, thus arguing that it was KVC's fault that the children could not be reintegrated. But the district court observed that this argument ignored three important things: (1) The children were previously removed from the home because of the home's unsanitary condition, (2) workers told them several times how to keep the home clean, and (3) the children's school attempted multiple interventions with the parents on how to address their hygiene issues. The court determined that DCF was not responsible for going in and cleaning the home for them—the agency workers told them multiple times what needed to be done, and they failed to do it.

The district court further noted that the parents testified about their ongoing mental health issues. Mother indicated she would have more success carrying out daily living activities following her psychological evaluation, yet she could not address why she was not spending every waking moment cleaning the home so the children could come back. She also stated that she had been checking in with a psychiatrist for 12 to 14 years for insomnia and posttraumatic stress disorder, but she was not seeking individual therapy to address these issues in-depth. Given that Mother's course of treatment had remained unchanged for the pendency of the cases, the court was not convinced that Mother would have more success controlling these issues in the future.

The court was also concerned because Father openly admitted to suffering from depression, and he did not attend individual therapy to address that condition. In other words, the district court explained that neither parent—despite being under a doctor's care—did anything to address their underlying mental health issues that may have "contributed to the decline and continual state of the family's residence." The district court found that these were clear examples of the parents' failure to adjust their circumstances to meet their children's needs, and it also noted the following:

20

"There was a very small section of the Mother's testimony that was for me the most telling of the mental state of these parents in terms of getter their children back home. . . . On . . . cross-examination by the State, [Mother] told the County Attorney that cleaning the residence took longer than it should have. One of the reasons was because they had an emotional attachment to their things and that it took a while to unattach and decide what was important and what was not. The (indiscernible) in the Mother's analysis is that while the parents were attempting to resolve this issue, these children, not things, but children have been in foster care. I don't want to suggest that these parents were not attached to these children; but the idea that they could not unattach to their things to get the children home and that two years have passed with so little progress is an indication that these parents could not or would not prioritize the children over [their] literal personal property."

Based on the testimony presented and based on how long the children had been out of the home, the district court then found that it was in the best interests of the children that Mother and Father's parental rights be terminated. The children were ordered to remain in DCF custody to enable exploration of other permanent placement options, including adoption.

Mother and Father have timely appealed the district court's findings.

ANALYSIS

Although there are stylistic and organizational differences in presentation of the issues on appeal by the briefs of Mother and Father, their respective arguments boil down to two common areas of complaint about the district court's rulings. We will deal with each of these key issues in turn.

*Whether clear and convincing evidence supported a finding the parents were unfit and their conduct was unlikely to change in the foreseeable future.*

The district court is required to make three findings before terminating parental rights. The court must find by clear and convincing evidence that the parent is unfit, the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future, and that termination of parental rights is in the best interests of the children. K.S.A. 2019 Supp. 38-2269(a), (g)(1).

When reviewing a finding of parental unfitness, we must determine, after reviewing all of the evidence in a light most favorable to the State, whether a rational fact-finder could have found the determination to be highly probable, i.e., by clear and convincing evidence. In making this determination, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

In their appellate briefs, Mother and Father argue that the district court's finding of unfitness was not supported by clear and convincing evidence. To support her argument, Mother summarizes Stockard's and Hester's testimony from the termination hearing and claims that given the testimony presented and her substantial completion of the case plan tasks, we should reverse the district court's finding of unfitness.

Mother also argues that there was not clear and convincing evidence to establish that her unfitness was unlikely to change in the foreseeable future. Specifically, Mother submits that the State's witnesses failed to present any evidence about how Mother's unfitness was unlikely change in the foreseeable future. In his brief, Father states in passing that the State said in closing arguments that history would likely repeat itself. He notes that "no such standard is an element [of K.S.A. 2019 Supp. 38-2269] for severance

of parental rights." Otherwise, Father makes no specific challenge to the foreseeable future requirement.

As provided in K.S.A. 2019 Supp. 38-2269(a), the State must prove a parent is unfit "by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine factors that singularly or in combination may constitute unfitness. K.S.A. 2019 Supp. 38-2269(b), (f). The statute lists four other factors to be considered when, as here, the parent no longer has physical custody of a child. K.S.A. 2019 Supp. 38-2269(c).

After a careful examination of the record, we believe there exists clear and convincing evidence supporting the district court's ruling that the Mother and Father were unfit to parent J.L., M.L., and A.L. There are three different factors the district court relied upon in making its unfitness finding, and we consider each of them individually.

*K.S.A. 2019 Supp. 38-2269(b)(7)*

A district court may find a parent unfit if there is clear and convincing evidence that the reasonable efforts made by public or private agencies to rehabilitate the family have failed. K.S.A. 2019 Supp. 38-2269(b)(7). Here, clear and convincing evidence supports this finding.

The evidence presented at the termination hearing established that the parents had the benefit of agency services dating back to May 2015—which is when J.L. was removed from the home in a previous CINC matter. From May 2015 to January 2016, KVC worked with the family to address the condition of the home and the children's hygiene issues. Despite these services and despite Stockard's continued efforts to address how to clean the home with the parents, M.L. and A.L. were removed from the home in

23

January 2016 due to the home's extremely unsanitary conditions. This triggered another previous CINC matter. Throughout the course of the previous CINC cases, Mother and Father continued to receive agency services to address the condition of the home. At some point, the parents cleaned the house to the point where the children returned. The parents continued to receive ongoing agency services.

However, in January 2017, Stockard was called to the home again to investigate a report of unsanitary conditions. She testified that the home was in much the same condition as when she first investigated it back in December 2014. She once again spoke with the parents about how to clean the home, and the parents continued to receive services. When Stockard returned to the home in August 2017, the home was still in essentially the same condition as it had been her previous visit. At that time, Stockard requested that the children be removed from the home because of the unsanitary conditions.

Even after the children were placed in DCF custody, the parents continued to receive agency services. The agencies created case plan tasks for the parents to follow, and while they complied with several of the tasks, they were never able to comply with maintaining a clean and safe home for the children. Hester told the parents several times what they needed to do to clean the home to have visits with the children and to eventually reintegrate the children back into the home. Of critical importance, he emphasized that reintegration hinged on their ability to maintain clean and safe housing for the children. From the time the children were removed from the home to the termination hearing in August 2019, and despite having received constant ongoing agency services since May 2015, clear evidence shows the parents were still unable to maintain safe and clean housing. In fact, Hester testified the home was never safe or sanitary enough even for visits to occur in the home.

As the district court noted, the parents continuously blamed KVC and waited on KVC to give them specific instructions on how to clean the home. However, it was not DCF's or KVC's responsibility to clean the house for the parents—Mother and Father were repeatedly told what they needed to do, they had the benefit of continued services, and yet they failed to properly address the condition of the home all the way up to the termination proceedings. Despite the agencies' repeated efforts to help rehabilitate the family both before and during the pendency of these cases, they were unable to do so.

In their respective briefs Mother and Father essentially ask us to reweigh the evidence that was presented at the termination hearing and come to a different conclusion than the one reached by the district court. We cannot do so. See *In re K.L.B.*, 56 Kan. App. 2d at 445.

In summary, we hold there to be clear and convincing evidence that the parents were unfit under K.S.A. 2019 Supp. 38-2269(b)(7), because reasonable efforts by DCF and KVC failed to rehabilitate the family.

*K.S.A. 2019 Supp. 38-2269(b)(8)*

A district court may find a parent unfit if there is clear and convincing evidence that the parent has failed to adjust his or her circumstances, conduct, or conditions to meet the needs of the children. K.S.A. 2019 Supp. 38-2269(b)(8). Here, once again, we find that clear and convincing evidence supports this finding by the district court.

While the parents' psychological evaluations were not submitted as evidence during the termination proceedings, they were testified about at some length. In Mother's situation, there were concerns that she would withdraw and isolate when she became too overwhelmed. As to Father, there were concerns that he was unable to function at a level to provide proper care for the children. Collectively, the evaluator noted that the parents

25

would need constant ongoing case management services to function and provide a safe environment for the children. Even Father agreed that the family would benefit from such services.

Notably, both parents admitted that their mental health issues played a role in letting the house become unsanitary before the first set of CINC cases and again before the second set of CINC cases. Mother specifically admitted that she had an emotional attachment to the things in the house, making it difficult for them to clean the home at a faster rate. They even rented multiple storage units to store items from the home instead of disposing of them. Father specifically admitted that he suffered from depression and that he was a hoarder. Neither parent could substantively articulate a plan for how to deal with their underlying mental health issues if they would become a problem with the children back in the home. They merely stated that they would have a better handle on it, take time to regroup, take their medications, and go through their to-do lists. They also indicated they would continue checking in with their psychiatrist that both had been seeing for several years. Yet while both parents saw the same psychiatrist, both admitted they would merely check in to refill their prescriptions every two to three months as opposed to engaging in therapeutic services to address their underlying issues. Both parents also admitted they did not engage in individual therapy during the course of these cases, despite knowing that their underlying issues likely contributed to the home's decline before both sets of CINC matters.

As the district court correctly noted, neither parent—despite having been treated by a psychiatrist for years—did anything new to address their underlying mental health issues as a result of these cases. The evidence clearly pointed to the conclusion that both parents' course of treatment had remained unchanged. There is no evidence in the record to suggest that the parents would suddenly change course while maintaining the same mental health treatment as they have been for several years, despite their promises to

change. As Hester pointed out, this is a major concern given the fact that J.L. is intellectually and developmentally delayed and needs constant adult care and supervision.

In this case, it is particularly noteworthy that the parents did not really make any significant progress toward cleaning the home until after the State filed its motion for termination of parental rights in July 2019. Even as of the termination hearing in August 2019, the parents admitted there was still a lot of work to be done to clean up the home and the urine odor still remained. Visits were never allowed to occur in the home because of the unsanitary conditions. It was not as if the condition of the home was a new issue— it was a problem dating as far back as December 2014, and it was the subject of two sets of CINC actions. Even with ongoing agency assistance, the parents did not address the issue in a timely manner, nor did they address their underlying mental health issues that may have contributed to the problem in the first place.

Once again, as to this factor Mother and Father essentially ask this court to reweigh the evidence that was presented at the termination hearing and come to a different conclusion than the one reached by the district court. And, once again, we cannot do so. *In re K.L.B.*, 56 Kan. App. 2d at 445.

We hold there is clear and convicting evidence of unfitness under K.S.A. 2019 Supp. 38-2269(b)(8), through a showing that the parents have failed to adjust their circumstances, conduct or conditions to meet the needs of their children.

*K.S.A. 2019 Supp. 38-2269(c)(3)*

A district court may find a parent unfit if the children are not in the parent's custody, and there is clear and convincing evidence that the parent failed to carry out a reasonable plan directed toward reintegrating the parent and children. K.S.A. 2019 Supp. 38-2269(c)(3). Here, also, clear and convincing evidence supports such a finding.

27

The evidence at the termination proceedings established that the parents were unable to fully comply with three case plan tasks: (1) obtain and maintain a stable income and provide documentation showing that income to KVC on a monthly basis, (2) create a budget, and (3) maintain stable, safe, and clean housing. As outlined above in the factual history and in the previous analysis subsections, both Stockard's and Hester's testimony showed that the parents did not comply with these case plan tasks. Thus in the record there is clear and convincing evidence to support the district court's finding.

Just as before, as to this factor Mother and Father essentially ask this court to reweigh the evidence that was presented at the termination hearing. We reiterate that our law does not permit us to do so. *In re K.L.B.*, 56 Kan. App. 2d at 445. Consequently, we hold there is clear and convincing evidence that Mother and Father were unfit under K.S.A. 2019 Supp. 38-2269(c)(3), by failing to carry out a reasonable plan directed toward reintegrating the children with their parents.

Finally, in making a finding of unfitness, K.S.A. 2019 Supp. 38-2269(a) also requires a district court to find by clear and convincing evidence that a parent's conduct is unlikely to change in the foreseeable future. When measuring whether the conduct is unlikely to change in the foreseeable future, this court must consider time from the child's perspective, not the parents'. K.S.A. 2019 Supp. 38-2201(b)(4); *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014). This standard is required because children and adults have different perceptions of time, and children have the right to permanency within a time frame that is reasonable to them. Contrary to Father's argument that no such standard exists, a district court may also look to a parent's past conduct as an indicator of future behavior. See *In re K.L.B.*, 56 Kan. App. 2d at 447.

As we have previously observed, the condition of the home has been an issue since December 2014. Two separate CINC matters were filed as a result of the unsanitary nature of the home. As to this CINC matter, the three children have been in foster care

28

since they were removed from the home in August 2017. Visits were never allowed to occur in the home because the parents failed to clean the home to the point where it would be safe to have those visits. Mother even admitted that she was unsure why she was not spending every waking moment cleaning the home, despite the fact that she was unemployed.

The district court correctly noted that the passage of time should be a heavily weighted consideration in determining whether a parent should be found unfit. Given the history of the issues related to the conditions of the home, the parents' inability to address their mental health issues, their inability to make substantial efforts in cleaning the home throughout the course of the cases, and the length of time the children were in foster care, the evidence before the district court supports the finding that the parents were likely to be unfit in the foreseeable future.

Consequently, we find that the State presented clear and convincing evidence at the termination trial establishing that the parents were unfit based on K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8), and (c)(3), and it also established that their conduct was unlikely to change in the foreseeable future. For these reasons, we affirm the district court's finding of unfitness as to Mother and Father.

*Whether the district court abused its discretion in finding that terminating parental rights was in the children's best interests.*

Upon making a finding of unfitness of the parent, the district court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2019 Supp. 38-2269(g)(1). The preponderance of the evidence standard applies in making this best interests finding. *In re R.S.*, 50 Kan. App. 2d at 1115-16.

29

Because the district court is in the best position to make findings on the best interests of the child, we will not disturb its judgment in the absence of an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). A judicial action constitutes an abuse of discretion if the action when no reasonable person would agree with the district court or the district court premises its decision on a factual or legal error. *In re R.S.*, 50 Kan. App. 2d at 1116.

Both Mother and Father argue that the State provided no specific testimony or evidence as to how termination of their parental rights was in the best interests of the children. Specifically, the parents focus on one line in the transcript from the hearing where the district court judge made her ruling:

> "Further, as evidenced by the testimony of the witnesses and considering the . . .
> statutory factors set out in [K.S.A. 2019 Supp.] 38-2271, specifically (a)(5), I find it is in
> the best interest[s] of these three minor children that their parental rights be terminated."

K.S.A. 2019 Supp. 38-2271(a)(5) is one subsection of a statute which creates a series of rebuttable presumptions of unfitness under different factual scenarios. Under subsection (a)(5) of the statute, mentioned by the district court, the presumption of unfitness arises if "the child has been in an out-of-home placement under court order for a cumulative total of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home." K.S.A. 2019 Supp. 38-2271(a)(5).

Thus, based upon this single mention of the presumption statute by the district court, Mother and Father argue that the district court impermissibly relied on the statutory presumption of unfitness without making the necessary findings in order to properly invoke the statute. We are not persuaded by this argument.

Although the district court clearly did mention the presumption statute in its oral comments, it is equally clear to us that this was a simple misstatement of its intentions. We have reached this conclusion because nowhere else in the record does the district court rely on the presumption of unfitness statute in its orders. To the contrary, the district court made specific and detailed factual findings as to why it determined the parents to be unfit and ultimately why it was in the children's best interests to terminate parental rights. In fact, before detailing its findings on the record, the district court judge specifically stated the following:

> "[I]n coming to today's decision . . . I did not shift the burden to the parents by any presumption . . . [*I*] *considered the evidence as a whole* in determining whether the State and [GAL] have shown by clear and convincing evidence that these parents are unfit and whether it is in the best interest[s] of the minor children that their parental rights be terminated.
>
> "I would note for the record that it was the recommendation of the [GAL] that both of those requests be answered in the affirmative. I would also note for the record that after considering the evidence presented, taking into account and weighing the credibility and demeanor of the witnesses, arguments of counsel and the applicable statutes in [*sic*] case law, I find as follows[.]" (Emphasis added.)

From this comment, it is clear to us that the district court was not, in actuality, relying on the statutory presumption of unfitness under K.S.A. 2019 Supp. 38-2271(a)(5) in making its findings, but instead was looking to the totality of the circumstances and evidence. Unlike the parents, we find no cause for alarm in the district court's simple slip of the tongue, because the court later specifically disavowed use of the presumption.

Specifically, in considering whether termination was in the best interests of the children, the district court considered the length of time that the children had been out of the home and in foster care, it pointed to specific underlying mental health concerns that the parents failed to address, it noted the parents' inability to maintain clean and safe

housing despite years of ongoing services, it identified specific concerns about the parents' inability to adjust to J.L.'s special needs, and it noted that the GAL specifically advocated for termination in this case. It is clear that the district court relied on the totality of the evidence and testimony presented at the termination trial in making this best interests finding, rather than mechanically applying a presumption of unfitness under K.S.A. 2019 Supp. 38-2271(a)(5). We believe a reasonable person could agree with its decision that it was in the children's best interests to terminate parental rights based upon the court's consideration of the entire record.

The parents make no claim as to any factual error on the district court's part. However, we acknowledge that there could be some legitimate confusion caused by the district court's oral statement that it relied on the statutory factor outlined in K.S.A. 2019 Supp. 38-2271(a)(5), which creates the presumption of unfitness under the circumstances noted above. But ultimately the district court specifically found that this particular presumption did not apply in this case.

Nonetheless the district court noted that subsection (a)(5) outlined a one-year timeframe, which was an important factor indicating how heavily the passage of time should be weighed in determining whether a parent should be deemed unfit. In making its best interests finding, the district court stressed that the children had been out of the home for the pendency of the cases—almost two years at the time of the termination proceeding. Considered in context, the district court's decision did not actually find that subsection (a)(5) applied—it merely used it as a type of yardstick for establishing that the children needed permanency because they had been out of the home so long. Thus, it was in the children's best interests that the parents' rights be terminated so that permanency could be established. Therefore, we hold that the district court made no error of law.

In summary, we find that a reasonable person could agree with the district court's decision to terminate Mother's and Father's parental rights in this case. Additionally, we

can find no indication that the district court's conclusion was based on any factual or legal error. Accordingly, the district court did not abuse its discretion in finding termination of parental rights was in the best interests of the children. For these reasons, we affirm the district court's ruling.

Affirmed.